NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | **Criminal Action No. 25-683 (SRC)** |
| v. | : | |
| | : | |
| REGGIE HUGGINS. | : | **OPINION & ORDER** |
| | : | |
| | : | |

**CHESLER**, District Judge

This matter comes before the Court on Defendant Reggie Huggins's ("Defendant" or "Huggins") motion to suppress, (Dkt. No. 13, the "Motion"). In the Motion, Defendant moves to suppress all evidence obtained as a result of the September 17, 2020 stop and search of Huggins, including a firearm, ammunition, drugs, and any statements made by Huggins. The United States of America (the "Government") filed a brief in opposition to the Motion. (Dkt. No. 15, "Opp."). Defendant filed a brief in reply. (Dkt. No. 20, "Reply"). On December 11, 2025, the Court ordered that an evidentiary hearing on the Motion be scheduled. (Dkt. No. 16).

On January 27, 2026, the Court held an evidentiary hearing (the "Hearing") on the Motion in accordance with its December 11, 2025 order, during which it heard testimony from two Government witnesses, Detective Steven Resendes of the Newark Police Department ("Detective Resendes") and Detective Marc Castro of the Newark Police Department ("Detective Castro"), one Defense witness, Investigator Nicole Gaspar with the Office of the Federal Public Defender, and received photographs and documentary material into evidence. Following the Hearing, the parties filed supplemental briefing on February 18, 2026. (Dkt. Nos. 40-41, "Defendant Supp." and "Government Supp."). The Court has considered all papers filed in connection with the

-1-

Motion, as well as the evidence presented at the Hearing.  For the reasons set forth below, the Court will **DENY** Defendant's Motion.

## I.    FACTUAL BACKGROUND

Defendant Huggins is charged in a three-count Indictment with Possession of a Firearm and Ammunition by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1), Possession with Intent to Distribute Controlled Substances in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and Possession of a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A)(i).  (Dkt. No. 8).  The facts pertinent to the Motion are as follows:

In September 2020, officers of the Newark Police Department ("NPD") were told to be on alert for a black Chevrolet Impala which had been used in a nearby home invasion and homicide. On September 17, 2020, NPD Detectives Resendes and Castro were driving in an unmarked police vehicle when they spotted a black Chevrolet Impala, driven by Defendant, making a left turn onto Leslie Street.  The detectives trailed Defendant as he drove down Leslie Street and approached the traffic light at the intersection of Leslie Street and Lyons Avenue.

What happened next is the subject of the first of two issues that form the core of the Motion. According to the Government and the contemporaneous Incident Report, the detectives observed Huggins "improper[ly] pass vehicles on the right at the traffic light at the intersection of Leslie Street and Lyons Avenue," in violation of N.J.S.A 39:4-85.  (Gov. Ex. 201).  Then, when the light turned green, Huggins drove through the intersection, and the detectives activated their sirens to conduct a traffic stop.  As will be discussed below, Huggins vehemently challenges this description of events, arguing both that he: (1) *did not* violate the statute and (2) physically *could not have* violated the statute.  Huggins promptly pulled his car into a parking lot and the detectives approached the vehicle.

After pulling Huggins over, Detective Castro approached the passenger-side window and Detective Resendes approached the driver-side window. Detective Resendes then asked Huggins for his license, registration, and insurance. The events that followed make up the second issue at the core of the Motion. As Huggins reached for his wallet, Detective Castro observed what turned out to be a burnt marijuana cigarette in the car's center console cup holder. Defendant disputes: (1) whether Detective Castro actually saw this cigarette at all and (2) whether, even if he did see something that looked like a cigarette, he knew that it was, in fact, a *marijuana* cigarette.

Detective Castro then indicated to Detective Resendes that Huggins should be removed from the vehicle. Detective Resendes opened the driver-side door, and asked Huggins to exit the vehicle. Huggins exited the vehicle and began to shake nervously while stating, "I'm just coming to drop off some money." (Gov. Ex. 201). The detectives walked Defendant over to two of their colleagues who detained him. With the driver-side door still open, Detective Resendes walked back toward the car and noticed white rice on the floorboard as well as multiple tan rubber bands with a clear plastic bag sticking out from underneath the car's dashboard. Detective Resendes inspected the plastic bag inside the car and found more rice, as well as 52 glassine envelopes of suspected heroin, with the stamp "OG in God." Detective Resendes continued his search of the vehicle and found suspected heroin, oxycodone hydrochloride, and marijuana, as well as hundreds of dollars in cash, and a loaded nine-millimeter handgun.

## II.    MOTION TO SUPPRESS

Defendant's motion to suppress asks this Court to determine whether the actions of the NPD detectives on September 17, 2020 violated Defendant's constitutional right to be free from unreasonable search and seizure under the Fourth Amendment. Defendant argues that two key issues in the above-described sequence of events require suppression of the evidence obtained

from the traffic stop and subsequent search of Defendant's vehicle.  First, Defendant argues the detectives did not have reasonable suspicion to justify the initial traffic stop because Defendant did not and could not have violated N.J.S.A 39-4:85.  Second, even if the stop itself was constitutional, the detectives did not have probable cause to search the vehicle because Detective Castro could not have actually known that Defendant had a marijuana cigarette in the center console of the vehicle.  The Court finds that, based on the submissions of the parties and the evidence presented at the Hearing, the NPD Detectives had sufficient reasonable suspicion to lawfully pull over and conduct an investigatory stop of Huggins and developed probable cause to justify their subsequent search of his vehicle.

A. *Standing*

As a threshold matter, the Court disagrees with the Government and finds that Defendant does indeed have standing to bring this Fourth Amendment challenge even though this was his then-girlfriend, Natasha Johnson's, car.  Johnson provided an affidavit stating that she gave Huggins permission to drive this vehicle, which she owned.  (Def. Ex. 7).  This fact and the fact that Huggins had the keys to the car, together indicate that Huggins had a reasonable expectation of privacy in the vehicle sufficient to give him standing in this case.  See United States v. Montalvo-Flores, 81 F.4th 339, 343-346 (3d Cir. 2023) (finding standing where defendant was not an authorized driver of a rental car but was permitted to drive the vehicle by his girlfriend who was an authorized driver).  The Court is further unpersuaded by the Government's argument that Defendant's driving without a valid license foreclosed any reasonable expectation of privacy in the vehicle.  In support of its position, the Government cites to cases where courts held that unlicensed individuals in rental cars lacked standing.  See, e.g., United States v. Lyle, 919 F.3d 716 (2d Cir. 2019).  (Opp. at 22-23).  Whatever the logic of those decisions may be, they do not

-4-

apply to the circumstances in this case where Defendant had permission to drive the vehicle from its owner (which was not conditioned on his having a driver's license) and was found in possession of that vehicle. If the Government's argument were accepted, then, by extension, an individual sitting in a parked car with permission of the car's owner, but without a valid license, would not have a reasonable expectation of privacy in that vehicle. This is simply illogical.

B. *The Traffic Stop*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has held "that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (the Supreme Court discussing its prior holding in Terry). In the context of traffic stops, "[a]n officer may stop a car as long as he has reasonable suspicion to believe a traffic law has been broken." United States v. Blakeney, 2024 WL 1193099, at *2 (3d Cir. Mar. 20, 2024) (citation omitted). Courts must determine whether reasonable suspicion exists based on the "totality of the circumstances." United States v. Arvizu, 534 U.S. 266, 273 (2002). Additionally, "pretextual traffic stops supported by reasonable suspicion do not run afoul of the Fourth Amendment." United States v. Lewis, 672 F.3d 232, 237 (3d Cir. 2012). The Court has carefully considered the evidence presented in connection with the Motion and concludes that the NPD detectives had reasonable suspicion to conduct the traffic stop of Huggins.

First, Defendant contends that Detectives Resendes and Castro did not have reasonable suspicion to pull him over for a violation of N.J.S.A 39:4-85 which, under certain conditions to be explained below, prohibits drivers from passing on the right, because he did not and could not have

passed any cars on the right while driving down Leslie Street. Defendant argues that "Leslie Street is a residential one-way street with parked cars lined on both sides" and that "[t]here were cars parked alongside both sides of Leslie Street during the time of the alleged incident." (Mot. at 8). Defendant submitted an affidavit stating, among other things, "[t]here was no space for me to overtake any vehicle in front of me without colliding into the parked cars on either side of the road." (Def. Ex. 8). This description is in direct contrast with the Incident and Stop Reports filed by detectives shortly after the stop and with the testimony of the detectives at the Hearing, all of which alleged that Defendant did, in fact, pass on the right while on Leslie Street. (Gov. Exs. 201, 207; See Tr. at 14-15, 49-50, 100, 122).

Second, Defendant argues that even if he did pass on the right, he still did not violate N.J.S.A 39:4-85 which provides:

> The driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass at a safe distance to the left thereof and shall not again drive to the right side of the roadway until safely clear of the overtaken vehicle. If vehicles on the roadway are moving in two or more substantially continuous lines, the provisions of this paragraph and section 39:4-87 of this Title shall not be considered as prohibiting the vehicles in one line overtaking and passing the vehicles in another line either upon the right or left, nor shall those provisions be construed to prohibit drivers overtaking and passing upon the right another vehicle which is making or about to make a left turn.
>
> The driver of a vehicle may overtake and pass another vehicle upon the right as provided in this section only under conditions permitting such movement in safety. In no event shall such movement be made by driving off the pavement or main-traveled portion of the roadway.

In short, the statute establishes the general principle that a driver may only pass on the right if (1) there are two continuous lines of traffic or (2) the car in front of the driver is turning left. Once one of these conditions is met, a driver may pass another vehicle on his right but may only do so "under conditions permitting such movement in safety" and may not

do so by driving off the road. As there is no dispute that Leslie Avenue is not a two-lane street, Defendant's alleged passing on the right would only have been permissible if the car in front of Defendant was making a left turn. In his Affidavit, Defendant avers that he approached the intersection of Leslie Street and Lyons Avenue, stopped at the red light, and that the vehicle in front of him "had its left turn signal on." He further states that once the light turned green, "the vehicle in front of me made a left turn onto Lyons Avenue. I continued straight through the intersection." (Def. Ex. 8). At the Hearing, the detectives refuted this description of events, with both stating that the vehicle in front of Defendant drove straight and did not turn left. (Tr. at 50, 123).

After reviewing the statute and the parties contentions, it is clear that there are three primary questions regarding the traffic stop: (1) *could* Defendant have passed one or multiple cars on the right at the intersection; (2) *did* Defendant make such a pass; and (3) if he did pass on the right, were the vehicle or vehicles in front of him turning left, such that the pass was lawful. Ultimately the Court must wade through two conflicting versions of events (which cannot both be correct) and determine whether the Government has carried its burden of showing by a preponderance of the evidence that that the detectives had "some objective justification for the stop." United States v. Brown, 765 F.3d 278, 290 (3d Cir. 2014). Having considered the moving papers and giving great weight to the evidence elicited at the Hearing, the Court ultimately finds that the Government has indeed met its burden.

Defendant relies on a single self-serving affidavit, in which he insists that he could not have passed on the right due to the number of cars parked on either side of Leslie Street and that he did not conduct such a pass. (Def. Ex. 8). The affidavit similarly states that

the car in front of Defendant was making a left turn, (Id.), implicitly arguing that even if

Defendant did pass on the right, he was permitted to do so under the statute.  Defendant

was not cross-examined on this affidavit, making it difficult for the Court to come to a clear

credibility determination and weigh it against countervailing evidence.[1]  Further, self-

serving affidavits which are untested by cross-examination are of minimal evidentiary

weight or use in the context of evidentiary hearings.  See United States v. Gupta, 2025 WL

2821317, at *12 (S.D.N.Y. Oct. 3, 2025) (citations omitted) (noting that "a self-serving

affidavit is generally disregarded if [the affiant] declines to testify at the hearing" and

giving an opposing witness's testimony greater weight because it was "given under oath,

subject to cross examination, corroborated by other evidence in the record, and found

credible by the Court.").

Setting aside the affidavit, the actual evidence presented at the Hearing by

Defendant largely amounted to a speculative account, by an investigator with the Federal

Defender's office, of what the parking rules and dynamics *might* have been like on the day

of Defendant's arrest in 2020, based on her having visited and inspected the intersection at

issue three times in recent months (once in 2025 and twice in 2026).  (Tr. at 158).

Defendant proffered no evidence as to the parking rules and regulations on the day of the

incident nor did Defendant provide any evidence as to how cars were in fact parked that

day.  In other words, there is no meaningful evidence of record to support Defendant's

contention that at the time of the incident it would have been impossible for him to have

---

[1] The Court also notes that Defendant would not have forfeited his Fifth Amendment rights at trial merely by testifying at the suppression hearing.  See Simmons v. United States, 390 U.S. 377, 393–94, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (defendant who testifies at suppression hearing asserting Fourth Amendment claim does not waive his Fifth Amendment privilege and his statements cannot be used against him at trial on the issue of guilt).

passed on the right.  And, as even the investigator with the Federal Defender's office conceded at the Hearing, it is plausible that, given the variable day-to-day parking arrangements on Leslie Street and the layout of the intersection of Leslie and Lyons, Defendant could have, under the right circumstances, passed another vehicle on the right at the intersection.  (See Id. at 179, 185, 186-189; 191).

On the other side of the ledger, the Government has provided the contemporaneous Incident and Stop Reports and the testimony of both Detective Castro and Detective Resendes.  Ultimately all these sources of information tell the same core story: the detectives chose to follow Defendant because his Chevrolet Impala appeared consistent with the vehicle they had been told to look out for, and they planned to pull him over for the purpose of investigating any connection to the homicide in Irvington, but they activated their sirens and pulled Huggins over *only after* seeing him commit a traffic violation by passing on the right one or more vehicles, which were not turning left, in violation of N.J.S.A. 39:4-85.  Both detectives testified that: Defendant passed a vehicle on the right at the intersection (See Id. at 14-15, 49-50, 100, 122), when the light turned green both Defendant and the adjacent vehicle went straight through the intersection (See Id. at 53-55, 123), and they activated their sirens after observing the traffic violation.  (See Id. at 57, 124).

The Court also notes that both detectives exhibited some credibility issues when testifying about the stop.  For example, Detective Resendes testified at the Hearing that Huggins passed only one car on his right at the intersection, even though the Incident Report, which he wrote, used the term "vehicles" and not "vehicle" in describing Defendant's conduct.  (Id. at 45-49).  First, whether Huggins passed one or multiple

vehicles is of little significance to whether the detectives had reasonable suspicion sufficient to support a traffic stop. Second, Detective Resendes testified that the use of "vehicles" on the Incident Report was in error. (Id.). During his testimony, Detective Castro displayed what is best described as a misunderstanding of the law of pretextual stops. When pressed at the Hearing on whether the traffic stop was, in fact, pretextual, Detective Castro stated, "[n]o. Because we didn't have lack of reasonable suspicion to pull over the vehicle. We still had the BOLO." (Id. at 113).[2] But, both the fact that the Stop Report clearly indicated this was a pretextual stop (Gov. Ex. 207) and that Detective Resendes candidly testified that this was indeed a pretextual stop (Tr. at 35-37) bolster the officers' testimonies that they only pulled Huggins over after seeing him commit a traffic violation. Compare United States v. Abreu, (SRC), 2021 WL 3561247, at *4 (D.N.J. Aug. 12, 2021) (granting motion to suppress and rejecting the Government's argument that a law enforcement officer had reasonable suspicion to stop the defendant because the officer knew that the defendant was under FBI investigation and that a stop was justified on those grounds, even without a traffic violation). In any case, Detective Castro's testimony was largely consistent with both the Incident and Stop Reports and Detective Resendes's testimony. None of the other inconsistencies in the detectives' descriptions undermine their basic story, and the Court is not shocked that the witnesses' memories of the particulars of an event that occurred over five years ago may not be entirely perfect.[3]

---

[2] Detective Castro also suggested that he would have had reasonable suspicion to pull over any Chevrolet Impala that matched the car featured in the BOLO and was in "the area." (Tr. at 115). Detective Castro's clear misstatement of law is certainly alarming to the Court, but it is essentially irrelevant here because the evidence brought by the Government is more than sufficient to demonstrate by the preponderance of the evidence that a traffic violation did in fact occur.

[3] It is worth noting that part of the reason for the substantial lapse in time between the arrest and this Hearing is that Defendant absconded and the Government could not locate him for several

Ultimately, the Court's concerns about the detectives' credibility on certain issues do not outweigh the Court's view that the detectives were generally credible and that the Government has carried its burden of showing by a preponderance of the evidence that the detectives had reasonable suspicion to conduct this traffic stop. Accordingly, it holds that this pretextual stop of Defendant did not violate the Fourth Amendment. Lewis, 672 F.3d at 237 ("a pretextual traffic stop requires the officer to have observed a traffic violation prior to initiating the traffic stop.").

C. *The Subsequent Search*

As a general matter, the Fourth Amendment requires the Government to obtain a warrant before conducting a search, unless a specific exception applies. Schneckloth v. Bustamonte, 412 U.S. 218, ("[A] search conducted without a warrant issued upon probable cause is [presumptively] unreasonable . . . subject only to a few specifically established and well-delineated exceptions.") (citation omitted). The automobile exception "permits law enforcement to seize and search an automobile without a warrant if 'probable cause exists to believe it contains contraband.'" United States v. Burton, 288 F.3d 91, 100 (3d Cir. 2002) (quoting Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)). The plain view doctrine allows officers to seize evidence without a warrant if (1) they are at a lawful vantage point, (2) they see an item whose incriminating character is apparent without further investigation or manipulation, and (3) they have a lawful right of access to the item. United States v. Matthews, 597 F. Supp. 3d 694, 702 (D.N.J. 2022).

Here, Defendant argues that a Fourth Amendment search occurred the moment Detective Resendes opened Defendant's car door, and that the officers did not have

---

years. See United States v. Huggins, 2:21-cr-00533 (SRC), Dkt. No. 43 (Sealed Opinion) (dismissing the charges against Huggins for violation of the Speedy Trial Act *without* prejudice).

probable cause to believe there was contraband in the car to justify that search.[4]   While

Defendant essentially concedes that he did have a marijuana cigarette in the car's center

console by not denying it in his affidavit, he argues that: (1) Detective Castro likely could

not have seen it from a standing position outside the car, (2) even if he did see it, he could

not have known it was marijuana rather than nicotine, and (3) the Incident Report did not

indicate that the car smelled like marijuana or that Defendant appeared to be under the

influence of marijuana, further casting doubt on whether he in fact knew the cigarette

contained marijuana.   (Mot. at 17-19).   The Government counters that it stands by the

contemporaneous Incident Report which states, "as Huggins was reaching for his wallet

that was located in his back right jeans pocket Detective Castro observed in the center

console cup holder a burnt marijuana cigarette," (Gov. Ex. 207), and that based on his

training and experience, Detective Castro genuinely saw what he believed to be a marijuana

cigarette.   (Opp. at 17).

At the Hearing, Detective Resendes explained that the cigarette in the cup holder

was visibly different than a typical nicotine cigarette because of "the texture, the ashes, and

the way it was rolled up."   (Tr. at 23).   When asked to elaborate on the way the cigarette

was rolled, Detective Resendes stated, "[t]his was hand-wrapped. You could tell it's not

even.  There's lumps throughout the whole wrap."  (Id.).  The Court notes that one does not

need to be an expert to know that ordinary nicotine cigarettes and cigarillos are not

generally hand-rolled.   In a sense, common experience alone confirms what Detective

---

[4] The Government counters that Detective Resendes's opening of the car door did not, in fact,
constitute a Fourth Amendment search.  Because the Court finds that the detectives had probable
cause to believe the car contained contraband and a search was therefore justified, it need not
decide the issue of whether the opening of the car door did in fact amount to a Fourth Amendment
search.

Resendes stated on the record regarding why an officer (in this case, his partner, Detective Castro) would have recognized this as a marijuana cigarette. The photograph of the cigarette, which shows that it was lumpy and uneven, also supports Detective Resendes's testimony. (Gov. Ex. 410). When asked why he suspected the cigarette contained marijuana, Detective Castro stated that his training and experience dealing with drug crimes allowed him to determine that this cigarette was in fact a marijuana cigarette. (Tr. at 102). Both detectives also testified that they could smell marijuana emanating from the car. (Id. at 16-17, 102). Upon questioning by defense counsel as to why he did not include the smell of marijuana in the Incident Report, Detective Resendes stated that he thought writing that they spotted a marijuana cigarette "in plain sight" was sufficient for the Incident Report, and this Court agrees.

Defendant's contention that Detective Castro could not plausibly have even seen the cigarette is similarly misguided. Defendant argues that Detective Castro was too tall and too far away from the vehicle (despite his standing by the passenger-side window) to have seen the small cigarette. (Defendant Supp. At 8). This argument essentially asks this Court to presume that because Detective Castro was taller than the height of Huggins's vehicle, he would not have been looking down into the vehicle, where the cigarette would have come into his line of sight. Next, the argument goes, even if Detective Castro was looking down into the vehicle, he could not have seen the cigarette because he was "several feet away from it." Having marshaled no evidence that Detective Castro has vision problems, this argument strains credulity. Defendant further contests that because Detective Resendes testified that he did not initially see the cigarette, it stands to reason that, likewise, Detective Castro could not have seen it. (Id.). But, this ignores the fact that

-13-

Detective Resendes stood at the driver-side window, where his view of the center console would have been obscured by Huggins's entire body, whereas Detective Castro stood at the passenger-side window and had an unobstructed view into the vehicle.

Because the Court finds the detectives' description of their discovery of the marijuana cigarette credible, it finds that the search of Defendant's car was justified, even without a warrant.  See United States v. Matthews, 597 F. Supp. 3d 694, 703 (D.N.J. 2022) (stating that under the plain view exception, "having seen this contraband, the officers were empowered to examine or seize it" and that "[w]here an officer has probable cause to believe an automobile contains evidence of an offence, the so-called automobile exception permits a warrantless search of the vehicle.").

D.  *Prior Findings Regarding the Detectives*

Finally, the Court briefly addresses Defendant's attempts to undermine the credibility of the detectives in this case by referring to prior judicial findings on motions to suppress in which Detectives Castro and Resendes were involved.  See United States v. Price, 2021 WL 6062341 (D.N.J. Dec. 22, 2021); United States v. Jackson, 2022 WL 14834634 (D.N.J. Oct. 26, 2022).  While this Court holds Judge Wiggenton and Judge Hayden in the highest regard, the job of this Court is to determine the credibility of the detectives in *this and only this* matter.  The opinions of other Courts in cases involving completely different sets of facts and from over three years ago do not bear on this Court's assessment of the credibility of the testimony of Detective Resendes or Detective Castro in the case at bar. See United States v. Taylor, 2022 WL 3030524, at *1, n. 1 (E.D. Pa. July 29, 2022) ("The existence of another opinion addressing [the law enforcement officer's]

credibility does not aid the Court as a factfinder in this case because determinations of credibility are episodic.").

### III.   CONCLUSION[5]

For the foregoing reasons, Defendant has failed to persuade the Court that the detectives violated Defendant's Fourth Amendment rights by conducting an investigatory stop and subsequently searching his vehicle.  Accordingly, the evidence obtained as a result of that stop and search will not be suppressed at trial.

*     *     *

For these reasons,

**IT IS** on this 20th of February, 2026

**ORDERED** that Defendant's motion to suppress, (Dkt. No. 13), is **DENIED**.

*s/ Stanley R. Chesler*
STANLEY R. CHESLER, U.S.D.J.

---

[5] Because the Court denies the motion to suppress and holds that the Government has adequately shown that both the traffic stop and subsequent search were constitutional, it does not reach the Government's inevitable discovery arguments.  (See Opp. at 20-22; Government Supp. at 9-10). However, if the Court had concluded that either the stop or the search was unconstitutional, it is possible that that the Government's various inevitable discovery arguments, based on Defendant's lack of valid driver's license, the vehicle's expired registration, and Defendant's outstanding search warrant could have succeeded.  However, the Court can and does decide this Motion without reaching these issues.